Marc D. Fink (MN Bar No. 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
Phone: 218-464-0539
Email: mfink@biologicaldiversity.org

Allison N. Melton (CO Bar No. 45088)
Center for Biological Diversity
P.O. Box 3024
Crested Butte, Colorado 81224
Phone: 970-309-2008
Email: amelton@biologicaldiversity.org
*Applicant Pro Hac Vice*

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; SAVE LAKE SUPERIOR ASSOCIATION; SAVE OUR SKY BLUE WATERS; FRIENDS OF THE CLOQUET VALLEY STATE FOREST; and DULUTH FOR CLEAN WATER;<br><br>Plaintiffs,<br><br>v.<br><br>DEB HAALAND, SECRETARY OF THE INTERIOR; UNITED STATES FISH AND WILDLIFE SERVICE; UNITED STATES FOREST SERVICE; and UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      Plaintiffs Center for Biological Diversity, Save Lake Superior Association, Save Our Sky Blue Waters, Friends of the Cloquet Valley State Forest, and Duluth for Clean Water challenge the failure of Defendants Deb Haaland, the United States Secretary of the Interior; the United States Fish and Wildlife Service ("FWS"); the United States Forest Service ("Forest Service"); and the United States Army Corps of Engineers ("Corps") to comply with the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*., for the proposed NorthMet Mine Project and Land Exchange in northeastern Minnesota.

2.      Plaintiffs challenge (1) FWS's February 5, 2016 Biological Opinion for the NorthMet Mine Project and Land Exchange; (2) the Forest Service's reliance on the 2016 Biological Opinion when it approved the January 9, 2017 Record of Decision for the NorthMet Land Exchange; (3) the Corps' reliance on the 2016 Biological Opinion when it approved the March 21, 2019 Record of Decision for the Clean Water Act Section 404 Permit for the NorthMet Mine Project; and (4) the ongoing failure of FWS and the Corps to reinitiate and complete ESA consultation for the NorthMet Mine Project despite significant new information and substantial changes to the Project revealing that the Project may affect threatened species and critical habitat in a manner and to an extent not previously considered.

3.      Plaintiffs seek (1) declaratory relief that FWS violated Section 7 of the ESA in preparing and approving the 2016 Biological Opinion for the NorthMet Mine Project and Land Exchange; (2) declaratory relief that the Forest Service and the Corps each violated Section 7 of the ESA in relying on the unlawful 2016 Biological Opinion in issuing their Record of Decisions and related decisions; (3) declaratory relief that the June 28, 2018 land exchange between the

Forest Service and PolyMet is void; (4) declaratory relief that FWS and the Corps are in ongoing violation of the ESA by failing to reinitiate and complete ESA consultation for the NorthMet Mine Project; (5) an order vacating the 2016 Biological Opinion, the Forest Service's 2017 Record of Decision for the Land Exchange, and the Corps' 2019 Record of Decision and Clean Water Act Section 404 Permit; (6) an order requiring FWS and the Corps to reinitiate and complete ESA consultation for the NorthMet Mine Project; and (7) injunctive relief to enjoin any implementation of the NorthMet Mine Project pending full compliance with the ESA.

4.      The following map shows the location of the Plant Site, Mine Site, and Transportation/Utility Corridor for the proposed NorthMet Mine Project:



5.     The following is an aerial view of the Partridge River in northeastern Minnesota, near the proposed NorthMet Mine Site (photo by Rob Levine).



## JURISDICTION

6.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1346; 5 U.S.C. §§ 551 *et seq*.; and 16 U.S.C. § 1540(g) because this action involves the United States as a defendant and arises under the laws of the United States, including the ESA, 16 U.S.C. §§ 1531 *et seq*., and the APA, 5 U.S.C. §§ 551 *et seq*.  On November 10, 2021, Plaintiffs provided Defendants with notice of Plaintiffs' intent to file suit pursuant to the ESA citizen suit provision.  16 U.S.C. § 1540(g)(2).  An actual justiciable controversy exists between Plaintiffs and Defendants.  The requested relief is proper under 28 U.S.C. §§ 2201 & 2202; 5 U.S.C. §§ 705 & 706; and 16 U.S.C. § 1540(g).  The challenged agency actions are final and subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706.

**VENUE**

7.     Venue is proper pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A), because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District, Defendants have offices in the District, Plaintiff Center for Biological Diversity has an office in the District, and Plaintiffs Save Lake Superior Association, Save Our Sky Blue Waters, Friends of the Cloquet Valley State Forest, and Duluth for Clean Water reside in the District.

**PARTIES**

8.     Plaintiff Center for Biological Diversity ("the Center") is a nonprofit corporation headquartered in Tucson, Arizona, with offices in a number of states and Mexico.  The Center has an office in Duluth, Minnesota.  The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is actively involved in protecting threatened and endangered species, and their habitat, nationwide and in Mexico.  The Center has over 89,000 members throughout the United States and the world.

9.     Plaintiff Save Lake Superior Association is a nonprofit organization based in Two Harbors, Minnesota.  The Association, which originated in 1969, is the oldest citizen group working exclusively to preserve and protect Lake Superior.  It was organized to help stop the dumping of taconite tailings into Lake Superior by Reserve Mining, whose tailings were threatening human health and contaminating the water and aquatic life.

10.     Plaintiff Save Our Sky Blue Waters is a nonprofit public interest corporation based in Duluth, Minnesota.  Save Our Sky Blue Waters is a grassroots organization that seeks to protect the ecological integrity of Minnesota's Arrowhead Region.  From Lake Superior to the Boundary Waters, the Arrowhead Region is one of the most magnificent areas of the country, for

its boreal forests, wildlife, wetlands, and waters.  The protection of these valuable resources is Save Our Sky Blue Water's core mission.

11.     Plaintiff Friends of the Cloquet Valley State Forest is dedicated to the protection and preservation of the natural and cultural resources of the Cloquet Valley State Forest in northeastern Minnesota.  The lands, lakes, rivers, and streams of northern Minnesota, which lay north of Duluth in the Cloquet Valley State Forest and in the Arrowhead, are home to many people, plants, and animals, and serve the world in many ways.  Friends of the Cloquet Valley State Forest works to promote the responsible enjoyment of this unique treasure.

12.     Duluth for Clean Water is an all-volunteer nonprofit organization based in Duluth, Minnesota that seeks a healthy future for the St. Louis River and Lake Superior watershed. Duluth for Clean Water works through advocacy, education, and the political process to protect the health and safety of downstream communities from proposed upstream metal sulfide-ore mining, and to preserve northern Minnesota's greatest assets, its boreal forests, bogs and peatlands, and its fresh water.

13.     Plaintiffs bring this action on their own behalf, and on behalf of their members who derive recreational, inspirational, religious, spiritual, scientific, educational, and aesthetic benefits from Canada lynx, northern long-eared bats, and these wildlife species' habitats, including within northeastern Minnesota, on the Superior National Forest, and near the proposed NorthMet mine site.

14.     Plaintiffs' members regularly use and enjoy the Superior National Forest, and other lands near the proposed NorthMet Mine Project, for a variety of purposes, including hiking, canoeing, fishing, gathering wild rice, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities.  Plaintiffs' members derive

health, recreational, inspirational, religious, spiritual, scientific, educational, and aesthetic benefits from these activities.

15.     The areas of the Superior National Forest, and the other lands near the proposed NorthMet Mine Project, which Plaintiffs' members regularly use and enjoy, include the headwaters of the Lake Superior watershed, including the Partridge River watershed.  Plaintiffs' members use and enjoyment of these areas is significantly enhanced by the knowledge that imperiled wildlife species including the Canada lynx and northern long-eared bat have been identified in these areas, and that these areas are within the designated critical habitat for the Canada lynx.

16.     The NorthMet land exchange between the Forest Service and PolyMet has been executed, and therefore the proposed NorthMet mine site is now private land and Plaintiffs' members are now prohibited from accessing, using, and enjoying the exact mine site.  While the mining company and the Forest Service previously made it difficult for the public to access the proposed mine site, it is now no longer possible for Plaintiffs' members or the public to access, use, and enjoy the mine site as some members of the Plaintiffs were able to do prior to the land exchange.  Because this land is now private, and no longer part of the Superior National Forest, prior public notice and public involvement requirements no longer apply for proposed activities on this land, and a number of substantive environmental protections have been eliminated.

17.     During the ESA consultation for the proposed NorthMet Mine Project, FWS, the Forest Service, and the Corps recognized that the negative impacts to Canada lynx, gray wolves, and the northern long-eared bat and their habitat resulting from the Project would not be limited to only the proposed plant site and proposed mine site, but rather that surrounding areas and wildlife corridors would also be affected.  The agencies determined that the area that may be

7

adversely affected by the NorthMet Mine Project includes those areas within six miles of the Project, or approximately 250 mi$^2$ plus the area that extends to wildlife corridor number 18.[1]  The map below identifies this six-mile buffer.



18.     The areas of the Superior National Forest and other areas nearby the proposed NorthMet Mine Project that Plaintiffs' members regularly use and enjoy include specific areas within the six-mile radius that was determined by FWS, the Forest Service, and the Corps to be the area within which wildlife may be directly and indirectly affected by the proposed project.

19.     Plaintiffs' members' use and enjoyment of specific areas within this six-mile radius is significantly enhanced by the knowledge that imperiled wildlife species, including the Canada lynx and northern long-eared bat, have been identified in these areas, and that these areas are within the designated critical habitat for the Canada lynx.

---

[1] *See* 2016 Biological Opinion, p. 43; 2015 Biological Assessment, p. 6-1, 6-2.

20.     One example of Plaintiffs' members who use and enjoy areas near the proposed NorthMet Mine Project, and within the six-mile buffer, is Lori Andresen, who is a long-time member of several Plaintiff organizations.  Ms. Andresen is a resident of Duluth, and her family owns a cabin that is located on an in-holding in the heart of the Superior National Forest, near the town of Isabella, Minnesota.  Ms. Andresen enjoys canoeing, wild ricing, and fishing on the Embarrass and Partridge Rivers within the six-mile buffer of the project area, as well as hiking, photography, and other recreational activities within this area.  Ms. Andresen has made a number of trips to this area within the past few years, including multiple trips to the headwaters of the Lake Superior watershed in 2017, near the Partridge River and Stubble Creek, to hike, fish, take photographs, and look for wildlife and signs of wildlife; multiple trips to the Partridge River and Stubble Creek in 2018 to hike, take photographs, observe wildlife, and pick berries; multiple trips to the Partridge River and Embarrass River in 2019 to hike and fish; and another trip to the St. Louis and Partridge Rivers in 2021.

21.     Another example of Plaintiffs' members who use and enjoy areas near the proposed NorthMet Mine Project is Jacqueline Christenson, who is a member of Duluth for Clean Water and Center for Biological Diversity.  Ms. Christenson has been visiting the Superior National Forest all her life, and more specifically, recreated near the proposed NorthMet Mine Project in 2018 and 2019.  Ms. Christenson paddled the Partridge River in 2018, and paddled Colvin Creek to the Partridge River in 2019, just downstream from the proposed mine site.

22.     Plaintiffs' members intend to continue to regularly use and enjoy the Superior National Forest and other areas nearby the proposed NorthMet Mine Project, including areas within the six-mile radius of the mine site.  This includes specific and concrete plans to use and

enjoy areas nearby the proposed NorthMet Mine Project, including areas within the six-mile buffer, this coming spring and summer, 2022.

23.     One example of Plaintiffs' members who has plans to return and again enjoy specific areas near the proposed NorthMet Mine Project is Lori Andresen.  In June 2022, Ms. Andresen has plans to visit the Partridge River just south of the proposed mine site, as well as Colvin Creek and the South Branch of the Partridge River, to hike, fish, and take photographs.

24.     Another example of Plaintiffs' members who has plans to return and again enjoy specific areas near the proposed NorthMet Mine Project is Jacqueline Christenson, who has planned a multi-day canoe trip for July 2022, for the Partridge River and Colvin Creek.

25.     The health, recreational, inspirational, religious, spiritual, scientific, educational, and aesthetic interests of Plaintiffs and their members have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of the ESA and APA identified herein continue.  These are actual, concrete injuries caused by the Defendants' violations of the ESA and APA.  If the proposed NorthMet Mine Project is allowed to proceed without full compliance with the ESA, including updated and legally sufficient Section 7 consultation, Plaintiffs and their members will be harmed by the adverse, long-term, and permanent impacts to Canada lynx, northern long-eared bats, and critical habitat for the lynx.

26.     Plaintiffs' and their members' injuries will be redressed by the relief sought.  If the 2016 Biological Opinion and other related decisions are vacated, as requested, and/or the agencies are ordered to reinitiate consultation based on new information and changes to the proposal, the agencies will be required to undertake additional ESA consultation and analysis prior to determining whether or not the proposed action can proceed as proposed without jeopardizing the Canada lynx or northern long-eared bat, or adversely modifying or destroying

designated critical habitat for the Canada lynx.  As a result of the additional ESA consultation and analysis, the agencies may choose to make changes to the proposed project in a way that would benefit the Canada lynx or northern long-eared bat, or their habitat, or the agencies may choose to not authorize the mine to move forward as proposed.

27.     Defendant Deb Haaland, U.S. Secretary of the Interior, is the highest-ranking official within the U.S. Department of the Interior, and in that capacity, has ultimate responsibility for the administration and implementation of the ESA regarding terrestrial endangered and threatened species, including the northern long-eared bat and Canada lynx. Secretary Haaland is sued in her official capacity.

28.     Defendant U.S. Fish and Wildlife Service ("FWS") is an agency within the U.S. Department of the Interior.  It and its officers are responsible for administering the ESA, particularly regarding potential impacts to terrestrial wildlife species that have been listed as threatened or endangered with extinction pursuant to the ESA, including the northern long-eared bat and Canada lynx.

29.     Defendant U.S. Forest Service ("Forest Service") is an agency within the U.S. Department of Agriculture.  It and its officers are responsible for the lawful management of the National Forest System, including the Superior National Forest.

30.     Defendant U.S. Army Corps of Engineers ("Corps") is an agency of the U.S. Department of Defense.  The Corps is responsible for reviewing and issuing Section 404 permits under the Clean Water Act, as it did here.

**STATUTORY AND REGULATORY BACKGROUND**

**I.     The Endangered Species Act**

31.     Congress enacted the ESA in 1973 to provide "a program for the conservation of . . . endangered species and threatened species."  16 U.S.C. § 1531(b).  Section 2(c) of the ESA establishes that it is the policy of Congress that all federal agencies shall seek to conserve threatened and endangered species, and shall utilize their authorities in furtherance of the purposes of this Act.  16 U.S.C. § 1531(c)(1).

32.     The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."  16 U.S.C. § 1532(3).

33.     Section 4 of the ESA directs the Secretary of the Interior to list species that are threatened or endangered with extinction, and to designate "critical habitat" for such species.  16 U.S.C. § 1533(a).  "Critical habitat" is the area that contains the physical or biological features essential to the "conservation" of the species and which may require special protection or management considerations.  16 U.S.C. § 1532(5)(A).

34.     Section 4 of the ESA also requires the Secretary to develop and implement recovery plans for threatened and endangered species, unless the Secretary finds that such a plan will not promote the conservation of the species.  16 U.S.C. § 1533(f).

35.     The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  The ESA defines "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).

36.     The ESA requires the action agency, in consultation with FWS, to "insure that any action authorized, funded, or carried out by" the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the critical habitat of such species.  16 U.S.C. § 1536(a)(2).  FWS and the action agency must use the best scientific data available during consultation.  *Id.*

37.     "Action" is broadly defined under the ESA to include all activities or programs of any kind authorized, funded, or carried out by federal agencies, including actions directly or indirectly causing modifications to the land, water, or air; actions intended to conserve listed species or their habitat; and the promulgation of regulations.  50 C.F.R. § 402.02.[2]

38.     For each proposed action, the action agency must request from FWS whether any listed or proposed species may be present in the area of the proposed agency action.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.  If listed or proposed species may be present, the action agency must prepare a "biological assessment" to determine whether the listed species is likely to be adversely affected by the proposed action.  *Id.*

39.     If the action agency determines that a proposed action may affect any listed species or critical habitat, the agency must engage in formal consultation with FWS, unless the biological assessment concludes that the action is not likely to adversely affect any listed species or critical habitat, and FWS concurs with that finding.  50 C.F.R. § 402.14.

---

[2] FWS issued amended ESA regulations in 2019 and has proposed additional revisions.  The citations to the ESA regulations herein are to the version of the regulations that were in effect at the time of the challenged 2016 Biological Opinion, except for the regulation governing the reinitiation of consultation, for which we cite to the regulation currently in effect.

40.     To complete formal consultation, FWS must provide the action agency with a "biological opinion," explaining how the proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.

41.     If FWS concludes that the proposed action "will jeopardize the continued existence" of a listed species or result in the destruction or adverse modification of critical habitat, the biological opinion must outline "reasonable and prudent alternatives."  16 U.S.C. § 1536(b)(3)(A).

42.     If the biological opinion concludes that the action is not likely to jeopardize the continued existence of a listed species, and is not likely to result in the destruction or adverse modification of critical habitat, FWS must provide an "incidental take statement," specifying the amount or extent of incidental taking on such listed species and any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the action agency to implement those measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

43.     In order to monitor the impacts of incidental take, the action agency must monitor and report the impact of its action on the listed species to FWS as specified in the incidental take statement.  16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(iv), 402.14(i)(3).  If during the course of the action, the amount or extent of incidental taking is exceeded, the action agency must reinitiate consultation with FWS immediately.  50 C.F.R. § 402.14(i)(4).

44.     The reinitiation of formal consultation is required and must be requested by the action agency or FWS where discretionary federal involvement or control over the action has been retained or is authorized by law, and if (1) the amount or extent of taking specified in the incidental take statement is exceeded; (2) new information reveals effects of the action that may

14

affect listed species or critical habitat in a manner or to an extent not previously considered; (3) the action is modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (4) a new species is listed or critical habitat designated that may be affected by the identified action.  50 C.F.R. § 402.16(a).

45.     After the initiation or reinitiation of consultation, the action agency is prohibited from making any irreversible or irretrievable commitment of resources with respect to the agency action which may foreclose the formulation or implementation of any reasonable and prudent alternative measures.  16 U.S.C. § 1536(d).

46.     Section 9 of the ESA and its implementing regulations prohibit the unauthorized "take" of listed species.  16 U.S.C. § 1538(a)(1); 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31.  "Take" is defined broadly to include harming, harassing, trapping, capturing, wounding, or killing a protected species either directly or by degrading its habitat.  16 U.S.C. § 1532(19); 50 C.F.R. § 17.3 (defining harm to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering").

47.     Taking that is in compliance with the terms and conditions specified in the incidental take statement of a biological opinion is not considered a prohibited taking under Section 9 of the ESA.  16 U.S.C. § 1536(o)(2).

## II.     The Administrative Procedure Act

48.     Pursuant to the Administrative Procedure Act ("APA"), a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  5 U.S.C. § 702.  Agency

action made reviewable by statute and final agency actions for which there is no adequate

remedy in court are subject to judicial review.  5 U.S.C. § 704.

49.     The APA directs a court to compel agency action unlawfully withheld or

unreasonably delayed; and to hold unlawful and set aside agency action found to be arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law, or agency action

that is undertaken without observance of procedure required by law.  5 U.S.C. § 706.

## FACTUAL ALLEGATIONS

**I.     The Wildlife Species on the Superior National Forest Threatened with Extinction**

**A.    *The Canada Lynx***

50.     The Canada lynx is a medium-sized cat with long legs and unusually large paws

that make it highly adapted for hunting in deep snow.  A mid-size carnivore, the Canada lynx

plays an important ecological role in targeting smaller prey species that reproduce relatively

quickly.  In 2000, FWS designated the Canada lynx as a threatened species under the ESA.



51.     The majority of recorded lynx occurrences in Minnesota are from the northeastern

portion of the state, where the Superior National Forest is located.

52.     A number of land management activities on the Superior National Forest may

affect Canada lynx and lynx habitat, including mining exploration and other mining activities.

16

Land exchanges concerning proposed mining sites on the Superior National Forest may also result in a loss of lynx habitat, lynx prey habitat, and connectivity.

53.     Minerals management and mine development have the potential to adversely affect lynx and lynx critical habitat by reducing habitat quality for denning, foraging, and dispersal; disrupting travel, resting, and foraging patterns; and disturbing denning females and reducing habitat quality for lynx prey species.

54.     Direct lynx mortality on the Superior National Forest may result from trapping, shooting, predator control, and vehicle collisions.  Other large-scale risk factors to lynx and lynx critical habitat include the fragmentation and degradation of lynx habitat.

55.     Common causes of mortality for lynx include starvation of kittens and human caused mortality, including trapping.  Lynx in Minnesota have been killed by vehicle and train collisions.

56.     At the time of the 2016 Biological Opinion, there had been 63 lynx mortalities recorded in Minnesota since 2000.  Of these 63 mortalities, 29 died after being trapped, 16 died from unknown causes, 9 died from vehicle collisions, 7 died from being shot, and 2 died after collusions with trains.

57.     In 2005, FWS completed a "Recovery Outline" for Canada lynx.  The Canada lynx Recovery Outline serves as an interim strategy to guide recovery efforts and inform the critical habitat designation process for lynx until a draft recovery plan has been completed. Under the Recovery Outline, the lynx habitat on the Superior National Forest is identified as one of six "core areas" within the contiguous United States.

58.     The goal of the Recovery Outline is to address the threats to lynx so that its protection under the ESA is no longer required, and delisting is warranted.  Objectives include

17

ensuring that sufficient habitat is available to accommodate the long-term persistence of immigration and emigration between each core area and adjacent populations in Canada or secondary areas in the United States.

59.     On February 25, 2009, FWS issued a final rule revising the critical habitat designation for Canada lynx.  74 Fed. Reg. 8616 (Feb. 25, 2009).  By definition, the critical habitat designation includes the specific areas within the geographic area that is occupied by lynx and on which are found the physical and biological features that are essential to the conservation of the species.  16 U.S.C. § 1533(5)(A)(i).

60.     Within Minnesota, FWS designated critical habitat for Canada lynx in portions of Cook, Koochiching, Lake, and St. Louis Counties.  The majority of the Superior National Forest is within designated lynx critical habitat.

61.     The designated critical habitat for Canada lynx within Minnesota is considered essential because it is the only area in the Great Lakes Region for which there is evidence of recent lynx reproduction.  Moreover, it likely acts as a source for, or provides connectivity to, more peripheral portions of the lynx's range in the region.

62.     For the portion of the critical habitat designation within St. Louis County of Minnesota, FWS carved out the "mining district" and excluded it from the critical habitat designation.  74 Fed. Reg. at 8643, 8670.  According to FWS, in much of this mining district, mining has removed all vegetation.  Moreover, areas that are still vegetated are extensively fragmented by the mined areas and haul roads.

**B.**     *The Northern Long-Eared Bat*

63.     The northern long-eared bat was listed by FWS as a threatened species under the ESA in 2015.  In April 2016, FWS issued a final rule finding that designating critical habitat for the northern long-eared bat was "not prudent."

64.     Known for their long ears and secretive roosting and hibernating strategies, the northern long-eared bat is a temperate, insectivorous, migratory bat that hibernates in mines and caves in the winter and spends summers in wooded areas.  The bat generally hibernates from mid-fall through mid-spring each year.  The bats play an essential ecological role in keeping insect populations in check.



65.     Suitable summer habitat for the northern long-eared bat consists of a wide variety of forested habitats where they roost and forage.  Upon their emergence from the hibernacula (locations chosen by a species for hibernation) in the spring, female bats seek suitable habitat for maternity colonies.  Females give birth to a single offspring, typically in mid-May to early June each year.

66.     The main threat to the northern long-eared bat is an invasive and often deadly fungal bat disease commonly referred to as white-nose syndrome, which has rampantly spread in bat populations from the Northeast to the Midwest and Southeast of the United States.

Population numbers of the northern long-eared bat have declined by 99 percent in the Northeast. Due to white-nose syndrome, northern long-eared bats are also increasingly vulnerable to other stressors, such as habitat degradation and fragmentation, that further imperil the bat's population.

67.     In Minnesota, northern long-eared bat populations are known from 15 hibernacula.  At the time of the 2016 Biological Opinion, it was estimated that 3,000 northern long-eared bats hibernated in the largest known hibernaculum in Minnesota, the Soudan Mine in St. Louis County.

68.     At the time of the 2016 Biological Opinion, white-nose syndrome had not been detected in Minnesota.  The fungus that causes white-nose syndrome was detected within Minnesota in 2011-2012, but the fungus had not caused white-nose syndrome in bats within the state at the time of the 2016 Biological Opinion.

69.     In November 2015, FWS completed a biological opinion for activities affecting the northern long-eared bat within the Eastern Region of the National Forest System, which includes the Superior National Forest.  FWS concluded that these activities are not likely to jeopardize the continued existence of the northern long-eared bat.

70.     On January 14, 2016, FWS published a final "4(d) Rule" for the northern long-eared bat, pursuant to Section 4(d) of the ESA.  16 U.S.C. § 1533(d).  The 4(d) rule only prohibits the "incidental take" of northern long-eared bats within areas impacted by white-nose syndrome if the take occurs within known hibernaculum; results from tree removal activities that are within 0.25 mile of a known hibernaculum; or the implicated activities cut or destroy a known, occupied maternity roost tree or others trees within a 150-foot radius from the known, occupied maternity roost tree during the pup season from June 1 through July 31.  The rule also prohibits the purposeful take of the northern long-eared bat, except in limited circumstances.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.**     ***The Gray Wolf***

71.     Gray wolves are the largest wild members of the dog family, with adults weighing up to 175 pounds.  Gray wolves play a critical ecological role as a top predator and keystone species.  In response to their vastly declining numbers, FWS designated the gray wolf as an endangered species under the ESA in 1974.  The Minnesota population of gray wolves was reclassified as a threatened species in 1978.  FWS designated critical habitat for the gray wolf in Minnesota and Michigan in 1978.  All of the Superior National Forest was designated as critical habitat for the gray wolf.



72.     At the time of the 2016 Biological Opinion, the gray wolves in Minnesota remained listed as a threatened species under the ESA.  FWS estimated that the population of wolves in Minnesota at that time was approximately 2,220, with an estimated 484 wolves on the Superior National Forest.

73.     In 2020, FWS delisted almost all gray wolves in the lower-48 United States from the list of threatened and endangered species, including wolves in Minnesota.  85 Fed. Reg. 69,778 (Nov. 3, 2020).

74.     The Center for Biological Diversity and other organizations have challenged the gray wolves "delisting rule" in federal court.  *Defenders of Wildlife, et al. v. U.S. Fish and Wildlife Service, et al.*, 21-cv-344 (N.D. Cal.).

**II.     The NorthMet Mine Project and Land Exchange**

75.     PolyMet Mining Inc. ("PolyMet") proposes to construct an open pit mine in northeastern Minnesota to extract low- to medium-quality copper-nickel-PGE minerals.  The project, called the NorthMet Mine Project, is located in St. Louis County, about 60 miles north of Duluth, and 6 miles south of Babbitt.  The NorthMet Mine Project areas include the Mine Site (3,015 acres), the Plant Site (4,515 acres), and the Transportation and Utility Corridor that connects the Mine Site to the Plant Site (120 acres).

76.     The NorthMet Mine Project was proposed on the Superior National Forest, on lands where an open-pit mine was prohibited.  The Forest Service therefore proposed a land exchange between the Forest Service and PolyMet in order to eliminate the conflict between PolyMet's desire to surface mine and the United States' surface rights.  Because the NorthMet Mine Project is dependent on the land exchange, the land exchange is considered a connected action and interrelated activity, and both the NorthMet Mine Project and Land Exchange were considered together in the environmental analysis and documents.

77.     Three federal agencies have been involved in the environmental analysis and review for the NorthMet Mine Project and Land Exchange.  The Forest Service is an action agency due to the proposed Land Exchange between the Forest Service and PolyMet.  The Corps is also an action agency due to PolyMet's need for a Section 404 Permit under the Clean Water Act for the proposed Project.  And the Forest Service and the Corps were required to consult

with FWS under Section 7 of the ESA on the NorthMet Mine Project and Land Exchange due to the Project's impacts on Canada lynx, gray wolves, northern long-eared bats, and their habitat.

78.     The Minnesota Department of Natural Resources and the Minnesota Pollution Control Agency have also been extensively involved in the environmental review process for the NorthMet Mine Project due to a number of state permits that PolyMet was required to obtain.

## A.     *The 2015 Biological Assessment*

79.     In April 2015, the Forest Service and the Corps completed the "Biological Assessment for the Proposed NorthMet Project and Land Exchange," as required under Section 7 of the ESA.

80.     The Forest Service and the Corps determined that the Mine Site is used by the Canada lynx, gray wolf, and northern long-eared bat, and that the northern long-eared bat utilizes the Plant Site and Transportation/Utility Corridor.

81.     The Forest Service and the Corps concluded that the NorthMet Mine Project is "likely to adversely affect" Canada lynx, Canada lynx critical habitat, gray wolves, gray wolf critical habitat, and the northern long-eared bat.

82.     More specifically, the Forest Service and the Corps found that the NorthMet Mine Project would directly affect about 1,719 acres of lynx and wolf critical habitat within the Mine Site, and would result in the potential loss of available summer roost habitat at the Mine Site for the northern long-eared bat.

83.     The Forest Service and the Corps determined that the primary effects to lynx and wolves would be from the loss and fragmentation of habitat, the loss of habitat connectivity, and from fatalities associated with vehicle and rail traffic on the Mine Site, the Transportation and Utility Corridor, the Plant Site, and access roads and railroads to the Project area.  The agencies

determined that the primary effect to the northern long-eared bat would be loss of habitat.  In addition, noise and other disturbances could disrupt lynx and wolf use of travel corridors near the Project area.

84.     For purposes of preparing the Biological Assessment, the Forest Service and the Corps determined that the "action area for direct and indirect effects" included those areas within six miles of the Project.  According to the Biological Assessment, this area was determined by the FWS as the minimum area that needed to be assessed to identify Canada lynx that could be impacted by the Project.

**B.     *The 2016 Biological Opinion***

85.     On February 5, 2016, FWS completed the Biological Opinion for the NorthMet Mine Project and Land Exchange ("Biological Opinion").

86.     The NorthMet Mine Project would directly disturb at least 3,918 acres, including at least 1,719 acres at the Mine Site and 2,189 acres at the Plant Site.  The direct disturbance at the Mine Site includes 528 acres of open mine pits, up to 794 acres of overburden and waste rock stockpiles, and 397 acres of infrastructure.

87.     Ore would be excavated using drilling and blasting methods at the Mine Site, and then loaded and hauled by railroad approximately 8 miles west to the Plant Site for processing. At the Plant Site, the tailings waste from the ore processing would be placed in a tailings basin that would be built on an existing taconite tailings basin.

88.     FWS explained in the Biological Opinion that "action area" is defined by the ESA regulations to include all areas directly or indirectly affected by the federal action, and not merely the immediate area involved in the action.  For the action area of the Mine Site, Plant Site, and Transportation and Utility Corridor, FWS included an approximate 6-mile buffer for

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the effects analysis, and a wildlife movement corridor that was outside of the 6-mile buffer.  The 6-mile buffer was identified by FWS as the minimum area that could be impacted by the NorthMet Mine Project.

89.     FWS concluded in its effects analysis that the land exchange will lead to the subsequent development of the newly private lands, which would be an indirect effect of and caused by the land exchange, thereby resulting in significant adverse effects and the potential take of lynx, wolf, and northern long-eared bat.

90.     More specifically, FWS determined that species habitat effectiveness, including both quality and quantity, and use of the Mine and Plant Sites and surrounding area would be reduced due to vegetation removal and subsequent habitat fragmentation, and the increasing human presence, noise, traffic, and other factors as mining activities progress.

91.     The destruction of habitat at the Mine Site would include 1,333 acres of lynx denning, wolf cover, and northern long-eared bat roosting habitat.  The loss of lynx, wolf, and bat habitat will be permanent, except where the reclamation of forested habitat can occur, which will take at least several decades.

92.     The Mine Site and the eastern portion of the Transportation and Utility Corridor are within Lynx Analysis Unit ("LAU") #12 on the Superior National Forest.  The NorthMet Mine Project will result in the loss of at least 1,719 acres of lynx habitat in LAU #12.

93.     New roads will be constructed for the NorthMet Mine Project, mostly within the Mine Site.  These roads will be well-traveled and there will be noise and activity associated with construction and operations, 24 hours per day and year-around for up to 20 years.  In addition, there will be approximately 22 round trips daily of ore trains consisting of 16-20 ore cars.

94.     There will be an increase of approximately 346 vehicle trips per day and 45 train trips per day, totaling 391 per day in the action area above existing traffic levels.  The total miles of vehicle and train travel per day in the action area is estimated to be 3,608 vehicle miles and 423 train miles, for a total of 4,031 miles per day.

95.     Increased traffic volume will increase the probability for lynx and wolf mortality by vehicle and train collisions.

96.     Wildlife movement in the region of the proposed NorthMet Mine Project is already significantly restricted as result of extensive landscape changes, including past and current iron ore and taconite mining.  The NorthMet Mine Project would further adversely affect remaining wildlife travel corridors near the Mine Site.  More specifically, wildlife travel corridors #16 and #17 would be directly affected by mining-related activities.  Reduced or restricted access to travel corridors #16 and #17 may further adversely affect other adjacent travel corridors due to increased use from displaced lynx, wolves, and their prey.

97.     The Plant Site of the NorthMet Mine Project proposal is within the "mining district" that is excluded from the lynx critical habitat designation, while the Mine Site is located within the currently designated critical habitat.

98.     The NorthMet Mine Project would result in the long-term, and in most areas, permanent loss of lynx habitat at the Mine Site and contribute to habitat fragmentation.  Of the 1,719 acres of lynx critical habitat that would be destroyed at the Mine Site, only 202 acres have the potential to be eventually reclaimed with woody vegetation growth, although this may take many decades to be suitable as lynx habitat.  And even these 202 acres may never be conducive to use by lynx.  The remaining 1,519 acres will be permanently lost to lynx habitat, and further fragment the remaining habitat in the area.

99.     The NorthMet Mine Project would cause the permanent loss of at least 1,500 acres of lynx critical habitat to mining at the Mine Site, adjacent to the "mining district" that is already excluded from the lynx critical habitat designation.  This includes the loss of 1,333 acres of potential lynx denning habitat.

100.    The Biological Opinion does not address or consider the impacts of the NorthMet Mine Project on the recovery of Canada lynx.  The Biological Opinion does not address or consider the 2005 Canada Lynx Recovery Outline.

101.    The habitat loss caused by the NorthMet Mine Project may result in lynx, wolves, and northern long-eared bats abandoning the area temporarily or permanently, including portions of existing home ranges, territories, or roosting sites, to find suitable habitat.  Similarly, the harassment of lynx, wolves, and northern long-eared bats, through noise, motorized vehicles, and human presence, may result in their abandonment of habitat and leaving the general area.

102.    The loss of suitable habitat would not only further fragment the remaining habitat of lynx, wolves, and northern long-eared bats in the general vicinity, but likely also affect adjacent suitable habitats due to increased use, and other factors.

103.    Noise and other mining-related effects may diminish the habitat quality of adjacent habitats and travel corridors, contribute to fragmentation effects from the loss of habitat, and force lynx, wolves, and northern long-eared bats to travel farther to find available suitable habitat and prey resources.

104.    FWS determined in the Biological Opinion that the NorthMet Mine Project will result in significant adverse effects to the northern long-eared bat, gray wolf, and Canada lynx, including take.  Despite this determination, FWS concluded that the NorthMet Mine Project is not likely to jeopardize the continued existence of the northern long-eared bat, gray wolf, or

27

Canada lynx, and is also not likely to destroy or adversely modify critical habitat for the gray wolf or Canada lynx.

105.    The Biological Opinion included an "Incidental Take Statement."  FWS anticipated "incidental take" in terms of one lynx and one wolf killed by a vehicle or train every 20 years in the action area.

106.    FWS described additional incidental take through a surrogate of acres of habitat for the lynx, wolf, and northern long-eared bat primarily due to vegetation and overburden removal at the Mine and Plant Sites, and along the Transportation and Utility Corridor. According to FWS, vegetation removal on all these sites will total no more than 3,918 acres, including 1,719 acres at the Mine Site, less than 10 acres along the Transportation and Utility Corridor, and 2,189 acres at the Plant Site.

107.    FWS found in the Biological Opinion that direct incidental take of the northern long-eared bat may occur, but is not prohibited provided specific actions are implemented under the January 2016 final 4(d) rule for the bat.

108.    FWS concluded in the Biological Opinion that the anticipated incidental take will not jeopardize the continued existence of Canada lynx, gray wolf, or northern long-eared bat. FWS also concluded that "while there may be adverse effects to critical habitat for both lynx and wolf, it will not be adversely modified."

109.    FWS included two "reasonable and prudent measures" within the Incidental Take Statement, which it stated are necessary and appropriate to minimize take of Canada lynx, gray wolf, and northern long-eared bat.

110.    The first reasonable and prudent measure concerned the incidental take of lynx and wolves caused by vehicle collisions: "Implement proposed action Conservation Measures to reduce likelihood of vehicle collisions with lynx and wolf."

111.    The second reasonable and prudent measure concerned the incidental take of northern long-eared bats: "Implement measures to reduce the likelihood of injuring or killing any northern long-eared bats during vegetation removal, other mining-related activities, and forest management."

112.    FWS included two "terms and conditions" within the Incidental Take Statement. The first term and condition concerned the incidental take of the northern long-eared bat, and provided that PolyMet will not conduct any activities that disturb or disrupt hibernating bats if any hibernacula are found in the Project area.

113.    The second term and condition set forth "reporting requirements," including the requirement to report any vehicle collisions with lynx or wolves within 72 hours; the requirement to report any sick, injured, or dead bats; and the requirement for PolyMet to provide FWS with an annual report by January 31 of the following calendar year.

114.    FWS concluded in the Biological Opinion that no more than one Canada lynx and one gray wolf will be incidentally taken, and up to 3,918 acres of habitat for lynx, wolf, and northern long-eared bat will be removed, as a result of the proposed action during the 20-year duration of this biological opinion.  FWS stated in the Biological Opinion that if, during the course of action, this level of incidental take is exceeded, such incidental take represents new information requiring the reinitiation of consultation.

**C.**     ***The 2017 Forest Service Record of Decision for the NorthMet Project Land Exchange, and the 2018 Completion of the Land Exchange***

115.     In January 2017, the Forest Service issued its Record of Decision for the NorthMet Project Land Exchange.  The Record of Decision approved and authorized the Land Exchange between the Forest Service and PolyMet.

116.     The Forest Service in the 2017 Record of Decision relied on the 2016 Biological Opinion for its compliance with Section 7 of the ESA.

117.     On June 28, 2018, the NorthMet Land Exchange between the U.S. Forest Service and PolyMet Mining Company closed, with titles transferred.[3]

**D.**     ***The 2018 State Permits***

118.     On November 1, 2018, the Minnesota Department of Natural Resources issued the following permits for PolyMet's NorthMet Mine Project: (1) permit to mine; (2) two dam safety permits; (3) water appropriation permits; (4) an endangered and threatened species takings permit pursuant to Minnesota's state endangered species law; and (5) a public waters work permit.

119.     On December 20, 2018, the Minnesota Pollution Control Agency issued the following permits and certification for PolyMet's NorthMet Mine Project: (1) air emission permit; (2) water quality permit; and (3) Clean Water Action Section 401 Certification.

**E.**     ***The 2019 Corps Record of Decision and Clean Water Act Section 404 Permit***

120.     In March 2019, the Corps issued its Record of Decision for the NorthMet Mine Project.  The Record of Decision describes the Corps' decision to authorize PolyMet's

---

[3] *See* https://polymetmining.com/wp-content/uploads/2021/11/SEDAR-MDA-Q3-F21.pdf

30

discharges of dredge and fill material into waters of the United States, as part of the NorthMet Mine Project, pursuant to Section 404 of the Clean Water Act.

121.    In discussing the scope of analysis under the ESA, the Corps stated in the Record of Decision that the Action Area was determined to include the Project Area as well as a six-mile buffer, based on the extent to which the Project would cause indirect effects on the listed species.

122.    The Corps in the 2019 Record of Decision relied on the 2016 Biological Opinion for its compliance with Section 7 of the ESA.

### III.    New information and modifications to the action reveal effects of the NorthMet Mine Project and Land Exchange on threatened species and critical habitat in a manner and to an extent that was not considered in the 2016 Biological Opinion

123.    Subsequent to the February 5, 2016 Biological Opinion, there has been significant new information and modifications to the action that reveal potential effects of the proposed NorthMet Mine Project and Land Exchange on threatened species and critical habitat in a manner and to an extent not previously considered.

124.    The northern long-eared bat population has plummeted on the Superior National Forest, as white-nose syndrome is now present in Minnesota and has devastated bat populations.[4] From 2015-2017, capture rates of the northern long-eared bat on the Superior National Forest declined by 90 percent.  And from 2017-2019, none were detected.  At the Soudan Mine, where the northern long-eared bat hibernates, there were historically 2,000 bats detected.  By 2019, no bats were detected at Soudan Mine, and the survey was cancelled in 2020.

---

[4]  *See* "*An Update on Northern Long-eared Bat Management and Monitoring on the Superior National Forest,*" July 21, 2020, available at: https://sfec.cfans.umn.edu/2020-webinar-jul; *see also* "*Northern Long-eared Bat Roost Tree Characteristics 2015-2017,*" available at: https://conservancy.umn.edu/bitstream/handle/11299/204334/NRRI-TR-2018-41.pdf?sequence=1; *and* "*Bat Radiotelemetry in Forested Areas of Minnesota 2015-2017,*" available at:  https://conservancy.umn.edu/bitstream/handle/11299/204335/NRRI-TR-2018-42.pdf?sequence=1&isAllowed=y.

125.    According to a Forest Service biologist, researchers working on the annual bat census for the Superior National Forest used to net an average of 8-10 northern long-eared bats or little brown bats per night.[5]  By 2017, however, they averaged just two bats per night, and on many nights came up empty.  For the northern long-eared bat, they are not seeing any of them.

126.    According to a 2019 newspaper report, researchers in Minnesota have given up on their annual count of bats, deciding it is better to just leave any remaining bats alone.[6]  A mammologist for the Minnesota Department of Natural Resources commented that it is best to leave them alone, as "there's just nothing left to find."

127.    The expected size and output of the NorthMet Mine Project has significantly increased since the Project was analyzed by the Forest Service and the Corps in the 2015 Biological Assessment, and by FWS in the 2016 Biological Opinion.  PolyMet is now analyzing the development of substantially higher throughputs of 59,000 and 118,000-short ton per day at the NorthMet Mine Site, compared to the 32,000-short ton per day that was analyzed in the 2005 Final Environmental Impact Statement for the proposed project, and assumed by the agencies in preparing the 2015 Biological Assessment and 2016 Biological Opinion.[7]

128.    According to a 2019 news release by PolyMet, "proven and probable reserves" have increased by 14 percent to 290 million tons, and "measured and indicated reserves" have

---

[5]  *"We knew this was coming" – Bat numbers plummeting in Arrowhead*, July 12, 2017, by Marshall Helmberger in the Timberjay, available at:  http://timberjay.com/stories/we-knew-this-was-coming,13512.

[6]  *"Facing a bleak outlook, Minnesota bat researchers give up on annual count,"* December 8, 2019, by Greg Stanley in the Minneapolis StarTribune, available at: https://www.startribune.com/facing-a-bleak-outlook-minnesota-bat-researchers-try-a-new-tack/565934002/.

[7]  https://polymetmining.com/wp-content/uploads/2018/10/PN150163-PolyMet-NI-43-101-Technical-Report-2018_03_26_Rev0.pdf.

increased by 22 percent to 795 million tons, based on the results of the company's 2018-19

drilling program.[8]  And as further disclosed in a September, 2021 investor presentation, the

current mine plan that was assessed in the 2015 Biological Assessment and 2016 Biological

Opinion represents only one-third of the existing measured and indicated resource.[9]

129.   In the 2015 Biological Assessment and 2016 Biological Opinion, the Forest

Service, the Corps, and FWS considered that PolyMet was planning to purchase 2,169 acres in

Aitkin County, Pine County, and south-central St. Louis County as mitigation for the anticipated

impacts to wetlands resulting from the project.[10]  On these wetland mitigation sites, 1,603 acres

were going to be restored or converted to wetlands.  These "wetland mitigation sites" were part

of FWS' rationale in the Biological Opinion for why the project was not likely to jeopardize the

Canada lynx, gray wolf, or northern long-eared bat, or adversely modify the critical habitat for

lynx or the gray wolf.[11]  However, in the Corps' 2019 Record of Decision for the NorthMet Mine

Project, it is disclosed that rather than purchasing these sites for wetland mitigation, PolyMet

instead purchased credits at a wetland mitigation bank.[12]

130.   The extent and magnitude of additional planned and anticipated sulfide copper

mining in northeastern Minnesota has significantly increased since the 2015 Biological

Assessment and 2016 Biological Opinion.  Teck American Incorporated has ramped up

---

[8]  https://polymetmining.com/investors/news/polymet-drilling-program-results-in-additions-to-northmet-mineral-resources-and-reserves/

[9]  https://polymetmining.com/wp-content/uploads/2021/09/PLM-Investor-Presentation-Sept-2021.pdf

[10]  *See* Biological Opinion, p. 4.

[11]  Biological Opinion, p. 62.

[12]  March 21, 2019 Record of Decision, p. 11.

exploration nearby the NorthMet site, in what would become a massive mine straddling both the St. Louis and Rainy River watersheds.[13]  Encampment Minerals is also drilling exploratory boring holes nearby, just south of Hoyt Lakes, within a high biological significance area by the St. Louis River, and is also drilling near Birch Lake.[14]  And Twin Metals Minnesota has submitted a mine plan of operations to the state and federal agencies for a massive underground copper mine near Birch Lake.[15]

131.    The continued exploration, development, and expansion of these mine proposals will have significant impacts on Canada lynx, northern long-eared bats, and their habitat, including continuing to further fragment lynx habitat and negatively impact its few remaining travel corridors in the Mesabi Iron Range and Arrowhead Region of Minnesota.

132.    The Forest Service has further developed the science and expert understanding of the potential adverse impacts of a copper mine in this region, in response to the proposed Twin Metals copper mine within the watershed of the Boundary Waters Canoe Area Wilderness ("BWCAW").  This includes but is not limited to a December 14, 2016 letter from Chief Tidwell of the Forest Service to the BLM.  Based on its analysis, the Forest Service has found "unacceptable the inherent potential risk that development of a regionally-untested copper-nickel

---

[13] https://www.duluthnewstribune.com/business/energy-and-mining/4821744-Long-quiet-copper-nickel-project-asks-to-restart-exploratory-drilling; https://www.mesabitribune.com/teck-seeking-state-s-permission-to-explore-minerals-near-babbitt/article_4cd955f8-1d64-11ea-a717-4bbf07689793.html#//.

[14] https://www.duluthnewstribune.com/business/energy-and-mining/4870535-Encampment-asks-to-drill-for-minerals-near-Hoyt-Lakes.

[15] https://www.minnpost.com/environment/2019/12/what-you-need-to-know-about-the-twin-metals-mine-plan/.

sulfide ore mine within the same watershed as the BWCAW might cause serious and irreplaceable harm to this unique, iconic, and irreplaceable wilderness area."[16]

133.    The Forest Service's determination of unacceptable risk is in part due to the potential impacts to listed species including Canada lynx and the northern long-eared bat:

> Crucially, the BWCAW and SNF are considered critical habitat for the threatened Canada Lynx, which requires spruce-fir boreal forest with dense understory. Canada Lynx cover large areas, traveling extensively throughout the year, meaning that development and habitat fragmentation can affect the viability of lynx populations.

> The threatened northern long-eared bat lives in both Lake and St. Louis County, where [Twin Metals Minnesota's] leases are located. The northern long-eared bat spends its winter hibernating in caves. In summer it roosts in both live and dead trees, as well as caves. Northern long-eared bat populations are under significant stress from White-nose Syndrome, which has caused drastic declines in bat populations across the country. Increased impacts to their habitat could exacerbate population decline.[17]

## IV.    Plaintiffs' ESA notice letter

134.    Plaintiffs sent a letter to Defendants on November 10, 2021, providing notice of all allegations and claims included in this Complaint.  Defendants received Plaintiffs' notice letter on or before November 16, 2021.

## V.    The Status of the NorthMet Mine Project and Land Exchange

135.    According to PolyMet, the current status of the NorthMet Mine Project is that the mining company has received "all major state and federal permits" for the Project, "including Permit to Mine, air and water permits and federal wetlands (Section 404) permit."[18]

136.    PolyMet further summarizes the status of its permits as follows:

> PolyMet received its Permit to Mine from the State of Minnesota on November 1, 2018, a crucial permit for construction and operation of the Project.  The Minnesota Department

---

[16] Dec. 14, 2016 letter from Forest Service Chief Tidwell to BLM Director Kornze, p. 1.

[17] *Id.*, p. 16.

[18] https://polymetmining.com/operations/northmet-snapshot/

of Natural Resources ("MDNR") also issued all other permits for which the Company applied including dam safety, water appropriations, endangered and threatened species takings, and public waters work permits, along with Wetlands Conservation Act approval. In addition, PolyMet received air and water permits from the Minnesota Pollution Control Agency ("MPCA") on December 18, 2018.  Further, PolyMet received the federal Record of Decision ("ROD") and Section 404 Wetlands Permit from the U.S. Army Corps of Engineers ("USACE") on March 21, 2019, which was the last key permit or approval needed to construct and operate the Project. [19]

137.    As further noted by PolyMet, "[l]egal challenges contesting various aspects of the MDNR, MPCA, and USACE decisions are ongoing and have led to court rulings that have delayed the Project timeline."[20]

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### FWS's 2016 Biological Opinion Violates the ESA and APA

138.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

139.    FWS's 2016 Biological Opinion for the proposed NorthMet Mine Project and Land Exchange is unlawful under the ESA, and arbitrary and capricious under the APA, for at least the following reasons.

a)      In determining that the NorthMet Mine Project is not likely to jeopardize Canada lynx, and is not likely to adversely modify lynx critical habitat, FWS failed to analyze or consider the effects of the Project on the recovery of the lynx.

b)      FWS failed to make a finding or determination as to whether the NorthMet Mine Project is likely to result in the destruction of designated critical habitat for the Canada lynx and gray wolf.

---

[19] https://polymetmining.com/wp-content/uploads/2021/11/SEDAR-MDA-Q3-F21.pdf

[20] *Id*.

c)      In its final determination and conclusion, in considering the impacts of the NorthMet Mine Project on Canada lynx, wolves, and the northern long-eared bat, FWS improperly combined "survival and recovery" into one standard, rather than considering each separately, thereby effectively reading "recovery" out of the statute.

d)      FWS failed to adequately explain why it was impracticable to express a numerical population measure of the anticipated incidental take of lynx, wolves, and northern long-eared bats caused by habitat destruction resulting from the NorthMet Mine Project.

e)      FWS failed to choose a proper surrogate instead of a numerical population measure of the incidental take of lynx, wolves and northern long-eared bats caused by habitat destruction, as the chosen surrogate fails to provide an adequate trigger for the reinitiation of consultation.

f)      FWS failed to provide reasonable and prudent measures, or terms and conditions, to minimize the incidental take of lynx, wolves, and northern long-eared bats caused by habitat destruction.

g)      In finding that the NorthMet Mine Project will not result in jeopardy or adverse modification of critical habitat, FWS improperly relied on conservation and mitigation measures that are not reasonably specific, certain to occur, capable of implementation, enforceable, or able to address the threats to the species.

h)      FWS failed to include any terms and conditions to implement Reasonable and Prudent Measure #1 concerning vehicle collisions.

37

i)      FWS failed to consider or address that the NorthMet Mine Project's permanent destruction of lynx critical habitat would revise FWS's critical habitat designation for lynx by expanding the "mining district" in Minnesota that is excluded from the designation.

j)      FWS failed to use the best scientific data available in makings its findings and determinations.

k)      FWS's determination that the NorthMet Mine Project is not likely to jeopardize the Canada lynx, gray wolf, or northern long-eared bat, and is not likely to adversely modify the designated critical habitat for the Canada lynx or gray wolf, is unsupported, lacks any rational basis, is in disregard of the best available science, is contrary to the evidence, and is arbitrary and capricious.

140.    FWS violated the ESA in preparing and approving the 2016 Biological Opinion. 16 U.S.C. § 1536; 50 C.F.R. § 402.14.  The 2016 Biological Opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA.  5 U.S.C. § 706(2)(A).  The 2016 Biological Opinion should be held unlawful, set aside, and vacated.  *Id.*

## SECOND CLAIM FOR RELIEF

**The Forest Service Violated the ESA in Relying on FWS's 2016 Biological Opinion**

141.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

142.    The 2016 Biological Opinion is unlawful, and thus the Forest Service's reliance on the Biological Opinion in signing, authorizing, and approving the January 9, 2017, NorthMet Project Land Exchange Record of Decision is arbitrary, capricious, and in violation of the ESA, 16 U.S.C. § 1536(a)(2).

143.    Because the 2016 Biological Opinion is unlawful, the Forest Service is in ongoing violation of its independent and substantive duty to ensure that the authorization and implementation of the NorthMet Project Land Exchange is not likely to jeopardize the continued existence of any listed species, or result in the destruction or adverse modification of designated critical habitat, in violation of Section 7 of the ESA.  16 U.S.C. § 1536(a)(2).  The Forest Service cannot meet its ESA Section 7 obligations for the NorthMet Project Land Exchange by relying on a Biological Opinion that is legally flawed.  *Id*.

144.    The Forest Service's Record of Decision for the NorthMet Project Land Exchange is arbitrary, capricious, an abuse of discretion, and contrary to the ESA.  5 U.S.C. § 706(2)(A). The Record of Decision should be held unlawful, set aside, and vacated.  *Id*.

### THIRD CLAIM FOR RELIEF

### The Corps Violated the ESA in Relying on FWS's 2016 Biological Opinion

145.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

146.    The 2016 Biological Opinion is unlawful, and thus the Corps' reliance on the Biological Opinion in signing, authorizing, and approving the agency's 2019 Record of Decision, and authorizing and issuing the Clean Water Act Section 404 Permit to PolyMet for the NorthMet Mine Project, is arbitrary, capricious, and in violation of the ESA, 16 U.S.C. § 1536(a)(2).

147.    Because the 2016 Biological Opinion is unlawful, the Corps is in ongoing violation of its independent and substantive duty to ensure that the authorization and implementation of the NorthMet Mine Project is not likely to jeopardize the continued existence of any listed species, or result in the destruction or adverse modification of designated critical habitat, in violation of Section 7 of the ESA.  16 U.S.C. § 1536(a)(2).  The Corps cannot meet its

ESA Section 7 obligations for the NorthMet Mine Project by relying on a Biological Opinion that is legally flawed.  *Id.*

148.    The Corps' 2019 Record of Decision, and the Clean Water Act Section 404 Permit for the NorthMet Mine Project, is arbitrary, capricious, an abuse of discretion, and contrary to the ESA.  5 U.S.C. § 706(2)(A).  The Record of Decision and Section 404 Permit should be held unlawful, set aside, and vacated.  *Id.*

### FOURTH CLAIM FOR RELIEF

**FWS and the Corps are in Ongoing Violation of the ESA for Failing to Reinitiate and Complete ESA Consultation on the NorthMet Mine Project and Land Exchange**

149.    Plaintiffs incorporate by reference all preceding paragraphs.

150.    Section 7 of the ESA requires the Corps to consult with FWS to ensure that any action authorized, funded, or carried out by the agencies are not likely to jeopardize the continued existence of any threatened or endangered species, or result in the destruction or adverse modification of the critical habitat of such species.  16 U.S.C. § 1536(a)(2).

151.    The reinitiation of consultation is required and must be requested by FWS or the Corps where discretionary federal involvement or control over the action has been retained or is authorized by law, and if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered, the action is modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion, or a new species is listed or critical habitat designated that may be affected by the identified action.  50 C.F.R. § 402.16(a).

152.    FWS and the Corps have violated and remain in ongoing violation of the ESA by failing to reinitiate and complete consultation on the impacts of the NorthMet Mine Project and Land Exchange despite relevant new information and modifications to the action revealing that

the Project may adversely affect listed species and critical habitat in a manner and to an extent

not considered within the 2016 Biological Opinion.  16 U.S.C. § 1536(a)(2); 50 C.F.R. §

402.16(a).

153.    The ongoing failure of FWS and the Corps to reinitiate and complete consultation

on the impacts of the NorthMet Mine Project and Land Exchange on threatened and endangered

species, and critical habitat, violates the ESA.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a).

154.    In the absence of the required reinitiated consultation, the Corps is in ongoing

violation of its obligation under Section 7 of the ESA to ensure that its actions are not likely to

jeopardize the continued existence of threatened and endangered species or result in the

destruction or adverse modification of designated critical habitat.  16 U.S.C. § 1536(a)(2).

**RELIEF REQUESTED**

WHEREFORE, the Plaintiffs respectfully request that this Court:

A.    Declare that the February 5, 2016 Biological Opinion for the NorthMet Project

and Land Exchange is unlawful under the ESA and arbitrary and capricious under the APA;

B.    Declare that the Forest Service's reliance on the unlawful 2016 Biological

Opinion in issuing the 2017 Record of Decision violates the ESA;

C.    Declare that the June 28, 2018 land exchange between the Forest Service and

PolyMet is void;

D.    Declare that the Corps' reliance on the unlawful 2016 Biological Opinion in

issuing the 2019 Record of Decision and Clean Water Act Section 404 Permit violates the ESA;

E.    Declare that FWS and the Corps are in ongoing violation of the ESA by failing to

reinitiate and complete ESA consultation for the NorthMet Mine Project despite significant new

information and changes to the Project revealing that the Project may affect listed species and

critical habitat in a manner and to an extent not previously considered;

F.      Set aside and vacate the 2016 Biological Opinion, the Forest Service's 2017

Record of Decision for the NorthMet Project Land Exchange, and the Corps' 2019 Record of

Decision and Clean Water Act Section 404 Permit;

G.      Order FWS and the Corps to reinitiate and complete ESA consultation for the

NorthMet Mine Project and Land Exchange;

H.      Enjoin any implementation of the NorthMet Mine Project pending completion of

a legally adequate Biological Opinion and full compliance with the ESA;

I.      Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable

attorney fees pursuant to applicable law including the Endangered Species Act, 16 U.S.C. §

1540(g); and the Equal Access to Justice Act, 28 U.S.C. § 2412; and

J.      Grant the Plaintiffs such further relief as may be just, proper, and equitable.

Dated January 25, 2022.          Respectfully submitted,

*/s/ Marc D. Fink*
Marc D. Fink (MN Bar No. 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
Phone: 218-464-0539
Email: mfink@biologicaldiversity.org

Allison N. Melton (CO Bar No. 45088)
Center for Biological Diversity
P.O. Box 3024
Crested Butte, Colorado 81224
Phone: 970-309-2008
Email: amelton@biologicaldiversity.org
*Applicant Pro Hac Vice*

*Attorneys for Plaintiffs*

42